### WADDINGHAM et al. vs. THE CITY OF ST. LOUIS.

1. There are only two modes of personal service pointed out by law—one is by reading the petition and writ; and the other is by delivering copies of them. The officer may pursue either mode, but the act does not seem to contemplate the propriety of separating the process, by reading one portion and delivering a copy of the other.

2. A municipal corporation, authorized by charter, to construct wharves, and other similar public conveniences, upon the lands of private citizens, are not bound to select, as agents, for the accomplishment of the work, the owner of the land, upon which the erection is proposed.

### APPEAL from St. Louis Court of Common Pleas.

Gamble & Kirtley, for appellants.

I. The first point insisted upon by the appellants is, the irregularity and insufficiency of the service of the process. The suit was brought under the new code. By the 4th section, article V. p. 78, it is provided that the service of a summons shall be: 1st. By reading the petition and writ to the defendant. 2nd. By delivering a copy of the petition and writ, &c. 3rd. By leaving a copy of the petition and writ at the usual place of abode of the defendant, with some white person of the family above the age of fifteen years.

The service in this case was neither the one nor the other, but was a selection of a portion of the first method pointed out by the statute, and tacking thereto a part of the second mode.

If this can be done, it is capable of demonstration, that instead of there being but three modes by which a writ may be served, as pointed out by the statute, there are, at least, twelve different and distinct methods by which a legal service may be had according to the whim or fancy of the sheriff. See acts 1848-9, § 4, p. 78; 1 Mo. R., 158, Hickman vs. Barnes; 1 Mo. R., p. 336, Cabeen vs. Douglass; 1 Peter's (Ark.) R., p. 50.

II. The second point insisted on, is, that the motion to set aside the default and permit the

defendant's answer to come in, should have been sustained. 1st, for the reason of the insufficiency of the service, and also for the reason set out in the affidavits filed with the motion.

The city election and general change of officers accrued on the 1st Monday in April. The former mayor left the city for the east. The city counsellor resigned his office, in the first week after that election. His successor gave bond on the 22nd of the month. In receiving the papers pertaining to the litigation of the city, the usual copy of the petition was not among them, nor was his attention called to this case until after default taken. The new mayor and city counsellor were necessarily pressed, for a time, greatly with business, with which they were yet unfamiliar, and in the great amount of legal business in which the city was then involved, this was overlooked. When its situation was discovered, the motion to set aside was made, at the return term, of the case, which, if granted, would have produced no delay whatever. A good and lawful defence was sworn to, and full and ample justice could have been administered according to the rights of the parties, without injustice to others. It was not a case of neglect, or want of due diligence.

III. The third point on which the appellant relies, is the insufficiency of the petition. The city charter either authorizes the city to condemn private property for public use, as a public wharf, or it does not. If it does not, then there was no jurisdiction to grant the injunction in this case, or to make it perpetual by the final decree. Gamble vs. City, 11 Mo. R., p. 617.

If it does confer the power, then, unless there are facts stated in the bill which would withdraw the property in question, from the exercise of the power, there is no ground for the injunction. There is no fact connected with the property in question which could prevent the city from condemning it, except, that the owners intended, some time in the future, to use it as a private wharf. This will not prevent its being condemned. Nor is this fact stated so that the court could properly act upon it.

IV. It is finally insisted on, that after the appeal was granted and perfected in this case, the circuit court had no power to set aside the first judgment and order a new judgment more comprehensive in its terms to be entered up *nunc pro tunc*. Cox R., 93, White vs. McCall; Ib. 160-1, Thompson vs. Thompson.

## SPALDING & SHEPLEY, for respondents.

I. The process was correctly served on the city, by delivering a copy of the petition to the defendant, and reading the writ. Acts 1848-9, p. 78, section 4; Revised Code, 1845, p. 237, section 2.

II. The plaintiffs have not, in their affidavits, on which the motion to set aside the judgment was based, made out a case of due diligence, and the court below, therefore rightly refused to open the judgment. 11 Mo. R., 192—mistake of attorney no excuse for default. 10 Mo. R., 392—negligence of attorney under circumstances like the present: 8 Mo. R., 686, negligence of attorney, no excuse; 7 Mo. R., 6 and 25—defendant relied on maker of note to defendant as he promised, and did not—no excuse.

6 Mo. R., 254—attorney surprised by cause coming on soon, not enough; 4 Mo. R., 557—neglect of party apparently, who had forgotten whether he had applied to counsel. These cases show that diligence and merits are both necessary here. The affidavits allege merits, perhaps, but are utterly defective as to the other point. The process was served months before the election. It does not appear that any attorney was applied to, or even advised of the existence of the suit, till after the decree had been entered; and no information was given to the city counsellor till three or four weeks after the commencement of the lower court.

III. Acts of assembly of 1846-7, p. 185. Act, authorizing the taking of wharves and paying therefor.

Acts of 1848-9, p. 502, as to purchasing and compromising so as to quiet title to wharf. Con-

stitution of Mo., art. XIII, clause 7, prohibits the taking of private property for public use without just compensation.

. IV. There is equity "in the petition, as the city has no right to appropriate the bank of a river for the purpose of revenue, when its appropriation for public use as a wharf," is not ncessary, the proprietors in fact, devoting it to that purpose, under that control of the city.

· The case is to be considered on the allegations of the petition alone; and they make out a case of an attempt of the city to condemn the land for purposes of revenue alone.  12 Pick. 480—private groperty cannot be taken for public use, merely for ornamental purposes.  The purposes must be both necessary and useful.

6 Howard, 507; p. 537—McLean, J., says, that if the size of the bridge after it was taken, was the same as before, he should consider the taking a void act.  At p. 543-4, Jus. Woodbury gives the limitation of the right of eminent domain, p. 545, last paragraph, also 548.

· 7 Pick., 451—"It is only in cases of public exigency that private property can be taken, and then only for public use, and upon making a just and reasonable compensation; 2 Kent Com. 276.  If property be taken for purposes not of a public nature, such law would be void; 3 Paige 45.  Railroads are for public use, and so are canals, ferries, bridges, &c., p 73-4.

3 Fairfield, 222, illustrates the subject as to what is public use.

3 Yerger, 41—land for a grist mill is for a public use.

2 Porter, 296—so land taken for roads is for public use.

It appears from these, and innumerable other authorities that might be cited, that land can be taken for the purpose of being used by the public, as a road, a canal, a bridge, or a mill, for a basin or a wharf, where the necessity exists that the public should have such use of it.  But it is not such use of it as is intended by the constitution, when land is taken for the purposes of revenue; nor is it taken for public use, nor does the exigency exist for taking it, when it is already applied exactly in the way it is purposed to use it when taken.  The word use in the constitution does not mean benefit.  The State cannot replenish its treasury by taking and condemning private property: but it can, under the right of eminent domain, take specific articles or pieces of property, to be used as such when public necessity requires it.  Taking property for purpose of revenue is in nature of a tax.

The legislature prohibits the taking of private property for public use, as a matter of revenue or pecuniary gain.  In the 19 section article 13, it is declared that all property subject to taxation in this State "shall be taxed in proportion to its value."  This is the annunciation of a great fundamental principle.  It is that in levying taxes on property, they shall be apportioned to the value.  In other words in raising revenue, i. e. money for the exigencies of government, contributions shall be made in proportion to the value of property.

Beside, the necessity of doing it can never exist, as the State has power to provide for its wants in this respect, by compelling all its citizens to pay in proportion to their estates such taxes or contributions as may be needed at any time.  To take the property of individuals for the ordinary purposes of revenue, is tyranny; and to possess that power ad libitum, constitutes the government a tyrannical one.  2 Sand. superior Ct. R., 98.

This clause in the constitution, providing the means of carrying on the government, is, in its character a negation of any other mode of doing it.  It embraces all the power conferred upon the legislature on that subject.

V. The court has power to interfere in this stage of the business by injunction, and prevent the condemnation of this property for the use of the city.

4 Johns. Ch. R., 53—city of N. Y. enjoined from proceeding to take possession and dig down the ground possesssd by complainant, for 25 years till they should show their title at law.

2 Story Eq., section 886—The injunction to restrain proceedings at law, are not confined to any point of the proceedings, but may be granted in any stage of the suit.

· Ib., section 927—it lies against corporations and others, to prevent abuse of powers given them, and to secure rights and privileges; and if the right be doubtful, the court will direct it to be tried by law; and in the meantime restrain all injurious proceedings.

Ib., section 926—it will be granted in cases of trespass if the acts done or threatened to the property would be ruinous or irreparable or unfair, the just enjoyment of the property in future."

2 Barb. Sup, C. Rep., 577—Injunction vs. City of N. Y., to restrain from appropriating portion of street: 3 Barb. Sup. C. R , 254; 16 Oh. R., 574—court can restrain by injunction, city from collecting a special tax levied improperly.

3 Paige, 573, Chamberlin vs. Mayor, &c.,'of N. Y. Injunction to prevent opening a street, must show that proceeding to be void, or fraud, or corruption, &c.

2 Barb. Sup. Ct. R., 9—courts say injunction is not the proper remedy in case of irregular taxation.

4 Barb. Sup. C. R., 17—injunction not the remedy where taxes are irregularly assessed. "If the droceedings are void, there is a perfect remedy at law, and the defect appearing on. the face of the proceedings, there is not such a cloud upon the plaintiff's title to lands, as can authorize a court of equity to set aside or stay the proceedings." "If the proceedings are not void, but merely voidable or irregular, the remedy of the plaintiff is not in this court, &c:" 4 Paige, 384—Injunction vs. Collector of Albany, to restrain him from collecting taxes.

9 Paige, 388, Vasdomisal vs. Mayor, &c., of city of N. Y. "Where a valid legal objection appears upon the face of the proceedings thereof, by which the adverse party can alone claim title to the complainant's land, there is not in law such a cloud upon the complainant's title as to authorize him to apply to chancery, but where claim of adverse party is valid on its face, there is jurisdiction.

8 Paige, 197, Messeroke et al. vs. Mayor, &c., of Brooklyn. That it was proper to interfere by injunction to restrain from an illegal act which would cast a cloud on plaintiff's title; 26 Wend , 132, p. 136, as to cloud on title; 5 Paige, 501, recognizes same doctrine, that chancery will interfere by injunction to prevent cloud being cast upon plaintiff's title to real estate, and not really diminishing its value.

3 Barb. Sup. Ct. R., 254, Bremen vs. Mayor; &c., N. Y. Injunction granted to restrain city from building houses, &c., and appropriating a public square for emigrants newly landed from Europe, &c. As law giver, a municipal corporation is irresponsible; it is then in the exercise of a purely governmental function; but it is responsible in acts of a different kind. Parson's Rep., 501, Hill et al. vs. Commissioners, &c. Injunction issued to restrain municipal corporation. 7 Watts & Serg., 107.

9 Howard, 32-33—as to dedication to public use, and that as to wharf property, presumption does not arise of dedication, it being of its nature to keep it open.

12 Mo. Rep , 617; Gamble vs. City, when a valid legal objection appears on the face of the proceedings, then there is not such a cloud upon the title as authorizes the court of equity to interfere; but where the claim is valid on its face, that is, of proceedings or instrument, and extrinsic facts are necessary to show the invalidity, a case is made out for interference of equity.

5 Paige, 501; 6 Paige, 262, as to interfering when the proceedings would cast a cloud on title, &c.

The legislature contemplated the existence of private wharves as is manifested by the provisions on the subject in every charter of this city.

Acts of 1821-2, p. 41, section 12, authorizes Mayor and Board of Aldermen to "erect, repair and regulate public wharves and docks, to regulate the erecting and the rates of wharfage at private wharves, &c." This act was approved 9 December, 1822.

Rev. C., 1825, p. 201, section 6—city authorities are empowered to do the same thing in the same words.

Private acts of 1834-5; p. 28, passed Feb. 26, 1835, p. 32, 33, section 32, is same power in same words with slight variation.

Acts of 1838-9, p. 156, passed Feb. 8, 1839, another charter; at p. 159, article 3, clause 17, same power in same words.

Acts 1840-1, p. 129, p. 132, clause 16, same power in same words.

14

Waddingham et al. vs. The City of St. Louis.

Acts 1842-3, p. 113, p. 117, clause 16, same power in substance—same words.

4 Mo. R., 343, Mullanphy's Ex'r vs. Daggart & Price—bank of river is private property, subject to use of navigators in the exigencies of navigation.

FIELD, for respondents.

I. The default in the court below was regularly taken, and no sufficient cause for setting it aside was shown.

1st. The service, though not a literal compliance with the new pract. acts, was in substantial comformity with its provisions, and justified a judgment for want of an answer. See Pract. act, 1849, article V. sect. 4.

By reference to sec. 6 of same article, it will be seen that the manner of service adopted by the officer was regarded by the legislature as of a higher grade than would have been necessary to hold the defendant to answer at the first term.

2nd. The reasons appearing in the affidavit for setting aside the judgment are, in the main, the same and certainly no better than those decided to be insufficient by this court at its present term. Allen's Ex'r vs. Carondelet.

II. The case made by plaintiffs below, in their petition, entitled them to the relief sought in their petition, and granted by the court.

1st. The plaintiffs show a title to land on the river bank, which they had made a private wharf conformable to all existing regulations of the city. Their right to the property and revenues of this wharf cannot be questioned. (Hoig. Law Tracts 77) Hales Treatise on *portisbus maris* cap. 6; the wharf case, 3 Bland's R.; St. Louis city charter, 1843, art. 111, sec. 2, sub-division 16.

2nd. The city of St. Louis was not authorized to seize the private wharf of the plaintiff, and condemn it to public use, under the act of 1847, (see acts of 1847, p. 185;) for that act evidently contemplated a case where the property was used by the private proprietor for some different purpose. In the present case the "necessity" for taking the property does not exist, and of that necessity the courts of justice must judge. 2 Kent Com., 340.

3rd. The case is made stronger by the statement of the petition that the whole object of the proceedings of the city was to confiscate the revenue of the plaintiff's property under the pretext of a condemnation to public use.

4th. If the act of 1847, is to be construed as authorizing the proceedings of the city to condemn the plaintiff's property under the circumstances stated in the petition, then it is insisted that the act is unconstitutional and void. West River Bridge Co. vs. Dix, 6 Howard's Report.

NAPTON, J., delivered the opinion of the court.

Waddingham and others presented a petition to the court of common pleas, asking an injunction to restrain the city authorities of St. Louis from condemning certain portions of their lands lying on the river and within the corporate limits of the city of St. Louis as a public wharf. The injunction was granted until the circuit court, to which tribunal the order was returnable, should make further order on the subject. A writ was issued from the circuit court, returnable to the April term, 1850, which was executed by "delivering a certified copy of the petition and

reading the writ to James G. Barry, mayor of the city of St. Louis." At the return term the defendant failed to answer, and judgment by default was entered, making the injunction perpetual on the city. On the 24th May a motion was made to set aside this judgment and permit the defendant to answer—but the motion was overruled—and the cause brought here by appeal.

The propriety of the judgments by default depends upon the sufficiency of the service of the writ. It is conceded, that this return does not show a service literally conforming to either of the modes of service directed by the 4th section of the 3d article of the practice act. It is however contended, that it is a substantial compliance, and therefore should be upheld. Since the first mode of service specified in the law is by reading the writ and the petition, it is thought that leaving a copy of the petition, which is a more formal service than reading it, will not make the service less beneficial to the defendants than it would have been if the petition had been merely read.

There are only two modes of personal service pointed out by the act, one is reading the petition and writ and the other is by delivering copies of them. The officer may pursue either mode, but the act does not seem to contemplate the propriety of separating the process, by reading one portion and delivering a copy of the other. It is probably designed that the entire process, writ and petition, shall be served in the same way. It might have been provided, that it would be sufficient to serve the entire process in either of the two modes specified, so that if the petition were served, either by reading or delivery, and the writ were served, either by reading or delivery, the service should be deemed good, and it may be admitted that no very good reason occurs, why the provision was not so framed. But we are inclined to adopt the more obvious construction of the provision as it now stands. There may be inconveniences attending the service of the same process in two different modes, not suggested by the circumstances of this case.

We do not consider it necessary to determine upon the sufficiency of the affidavits filed, which were designed to present reasons for opening the judgment by default. Had the service of the writ been sufficient, the history of the case would certainly present some difficulties growing out of the recent statute for " reforming the pleadings and practice in courts of justice." This proceeding, by whatever name it may be called, is substantially an interposition of judicial power to protect the citizen against what is deemed unconstitutional encroachments of the body politic. The practice act declares that the distinction heretofore existing between suits at law and in equity is abolished, and proceeds

to give a new name by which every form of action shall be hereafter distinguished. Incidental to the old forms had sprung up a variety of rules and precedents, by which the courts were governed, but in relation to which the new code is silent. To which system shall we look for guidance when such questions arise? Shall we go to chancery or common law, according as the proceeding now termed a civil action belongs in its character and nature, if not in its name; to the one or the other of these ancient systems? The judgment by default in a common law action stood upon a very different footing from that in which a decree *nisi* did in a court of chancery. There can be no question but that the present proceeding would have fallen within the province of the chancellor, and certainly there would have been no hesitation in setting aside a decree *nisi* taken under the circumstances which marked the judgment by default in this case.

The most important question discussed in this case is, whether the petition made out a case authorising the interference of the court. This question might be passed by, since the judgment by default must be set aside; but as the point is made and arises on the record, we will state our impressions of the law arising from the facts stated in. the petition.

We readily assent to the proposition, that it is but a semblance of exercising the eminent domain, for a state or a municipal corporation created by it, to appropriate the revenues of an existing franchise, already dedicated to the same public use for which it is ostensibly raised. If a bridge, or wharf, or road, already devoted to public use and regulated by the public authorities, is sought to be made tributary to the public revenue, under color of taking private property for public uses, it will be the duty of the court to interpose. But the facts disclosed in this petition do not call for the application of such principles. There was no private wharf in existence. The river bank owned by the complainants had been used as a place of boarding and without objections on their part—but this circumstance constituted no better objections to its being converted into a public wharf, with all the erections appropriate to such a purpose, than the owner of a tract of land would have to the building of a McAdamised road over that portion of it which was unenclosed and already open to public travel.

The complainants, it is true, aver that a design had been and yet was entertained by them, to erect a wharf for the accommodation of the public; that they had in fact, on the 2nd of November 1849, gone so far as to enter into an agreement among themselves and reduced that agreement to writing, to cause the river banks to be graded and otherwise suitably prepared for a public wharf; that in pursuance of this agree-

ment they had made contracts for the necessary works and expended money under said contracts. They further declare their entire readiness to submit to any regulations respecting the construction of such wharf and the rates of wharfage as the city authorities may dictate.

But it will be seen that the ordinance of the city (No. 2263) for condemning this land, with a view to make it a public wharf, was passed on the 10th of August 1849, before the agreement recited in the petition was executed, and so far as appears, before any design was entertained on the part of the proprietors to appropriate their land and money in this way. At the date of the ordinance the land of the petitioners seems to have been in a state of nature—no wharf had been erected or even commenced—nor had any single step been taken to put this land in a condition to be used in the mode and for the purposes for which it was desired.

This is not therefore an attempt on the part of the public authorities to assume, under pretext of public necessity, the management of a wharf already in existence, owned by private citizens, and dedicated to the same purposes for which the public authorities desire it.

The petition, however, assumes other grounds upon which the interposition of the court is asked. The petitioners declare they are willing to devote this land, at their own expense, to the same public use for which the city authories have seized it—and on such terms, as those authorities may direct—and to this end, they purpose to give such security as the court may direct to secure the fulfilment of their undertaking.

This presents a different question. Is a municipal corporation, authorized by the charter to construct wharves and other similar public conveniences, upon the land of private citizens, bound to select as agents for the accomplishment of the work the owner of the land upon which the erections are proposed? Is the power of the city or the State (where the State acts directly) arrested by an offer on the part of the citizen to do himself what the city or the State purposes to do with his private property? This would appear to be a matter of legislative discretion. Such a mode of procuring public conveniences may be often very desirable, but its adoption or rejection is addressed to the discretion of the political body through whom the corporation or state acts. The power of eminent domain is not affected by such propositions. Our constitution allows private property to be taken for public uses, upon making just compensation to the owner—but to say that this shall not be done, when the owner proffers to appropriate his property to the same use for which the public desire it, is to impose an additional restriction not pro-

vided for in the constitution.   If the petitioners could fully secure to the city the erection of this wharf, and as they propose, would further submit the rates of wharfage to be regulated by the city authorities, and in their discretion to be entirely abolished, it would certainly seem strange that so liberal a proposition should be declined.   But we have no power of reviewing the legislative discretion of the municipal authorities of St. Louis.   Their power to conduct this work, at their own expense, upon paying a just compensation to the owner of the land, has been delegated to them by the  State, and no sufficient objection to the exercise of this power has been suggested by the facts of  the petition.

We shall therefore reverse the judgment and dismiss the petition.